



⋆   ⋆   ⋆       ⋆   ⋆   ⋆

## MEMORANDUM OPINION

No. 04-11-00369-CR

Ricardo **LAUREL**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 229th Judicial District Court, Jim Hogg County, Texas
Trial Court No. 10-CRJ-55
Honorable Ana Lisa Garza, Judge Presiding

Opinion by:     Karen Angelini, Justice

Sitting:         Catherine Stone, Chief Justice
               Karen Angelini, Justice
               Marialyn Barnard, Justice

Delivered and Filed:   October 31, 2012

AFFIRMED

Appellant Ricardo Laurel was accused by the daughter of his common-law wife, T.G., of

sexual abuse. He was tried under Texas's Continuous Sexual Abuse Statute, TEX. PENAL CODE

ANN.

§ 21.02(b). After a jury found him guilty, he was sentenced by the trial court to seventy-five

years of imprisonment. On appeal, he argues the following: (1) he received ineffective assistance

of counsel, (2) the evidence was insufficient to support his conviction; (3) the prosecutor made

an improper argument to the jury during its closing argument; and (4) the trial court erred in denying his motion for mistrial. We affirm.

**BACKGROUND**

At trial, evidence was presented of the following timeline:

1. In 1997, T.G.'s parents, Jose G. and Jessica L., were married. Jessica L. was only fifteen years old at the time. Jose G. was in his twenties.

2. On May 20, 1997, T.G., the complainant, was born. Jessica L. and Jose G. then had two more children, both boys, who were born on March 26, 1998, and May 25, 1999, respectively.

3. In 1998, Jose G. and Jessica L. separated.

4. On December 6, 2001, Jessica L. gave birth to another boy by another father.

5. In 2005, Appellant Ricardo Laurel and Jessica L. began dating. Jessica L. was living in an apartment with her four children in Hebbronville, Texas. T.G., the eldest, was eight years old. On November 20, 2005, Laurel moved in with Jessica L. Laurel, Jessica L., and her children lived in an apartment together for about a year and a half.

6. On April 26, 2007, Laurel, Jessica L., and her children moved to Jessica L.'s father's home on Dannelly Street in Hebbronville.

7. On September 1, 2007, Texas's Continuous Sexual Abuse Statute became effective for acts occurring after that date. T.G. was ten years old and starting the fifth grade.

8. On December 3, 2007, after being separated for many years, Jessica L. and Jose G. (T.G.'s parents) were officially divorced.

9. In the summer of 2008, T.G. and one of her brothers moved to Houston and lived with their uncle, her father's brother.

10. A few weeks after T.G. and her brother move to Houston, an investigator with Child Protective Services visited Jessica L.'s home, telling Jessica L. that CPS had received an allegation that the children were being neglected. When asked by the investigator, both Jessica L. and Laurel admitted to drug use.

11. On October 14, 2008, after a Child Protective Service investigation, Jessica L. agreed to modify her divorce decree so that Jose G. obtained custody of their three children.

12. In November of 2008, T.G., who was eleven years old and in the sixth grade, moved to Ben Bolt, Texas, to live with her father, Jose G.

13. In an effort to have her children returned to her care, Jessica L. and Laurel took classes for drug abuse and underwent drug tests. Eventually, Jessica L.'s other son (T.G.'s half-brother), who had been placed with Jessica L.'s neighbor during the CPS investigation, was returned to Jessica L. T.G. and her other brothers remained with their father, Jose G.

At trial, Jose G. testified that by March 2, 2010, he had noticed a lot of changes in his daughter, T.G. He had discovered that T.G., who was twelve years old at the time and in the seventh grade, had had sex with a neighbor, a boy about the same age. Jose G. questioned T.G. about the boy and asked her why she was acting this way. T.G. told her father that something had happened to her while she was living with her mom. She told him that Laurel had sexually abused her when her mom left the home, leaving T.G. alone with Laurel. Jose G. then took T.G. to the sheriff's department in Ben Bolt where T.G. talked to a female officer. T.G. was then examined at a hospital in Corpus Christi and later interviewed by another investigator.

At trial, T.G. testified that Laurel had begun abusing her while the family still lived at the apartment in Hebbronville, and that he continued to abuse her after the family moved to her grandfather's home in Hebbronville. She stated that it ended when she moved to her uncle's home in Houston during the summer of 2008. T.G. testified that the abuse would happen in her mother's bedroom when her mother was away from the home. According to T.G., she performed oral sex on Laurel, and he performed oral sex on her. T.G. testified that she never told her mother, her father, or her grandmother about the abuse. She just told them that she wanted to move out of her mother's home. And, according to T.G., she wanted to move out of the home so that she could get away from Laurel.

On the night T.G. told Jose G. about the sexual abuse, Jose G. called his former wife, Jessica L., and told her about the allegations. Jessica L., who was twenty-nine years old at the time of trial, testified that she did not believe T.G.'s allegations. Jessica L. testified that she had never left T.G. alone with Laurel for extended periods of time and that T.G. loved Laurel.

According to Jessica L., T.G. always said that Laurel was her dad and that she did not love Jose G. because she never saw him. T.G. told Jessica L. that it was Laurel, not her father, who was always there for her. Jessica L. testified she observed only normal behavior between Laurel and T.G., and had no reason to think that anything was wrong between them. During her testimony, Jessica L. stated that when she was nine years old, she had been sexually abused by a family friend. According to Jessica L., because of her childhood experience, she was very sensitive to the issue and would constantly ask her children if anyone had ever done anything like that to them. She testified that they all, including T.G., responded, "No." According to Jessica L., T.G. loved Laurel and never showed any signs that she was scared of him. Instead, T.G. always wanted to be around Laurel. Jessica L. testified that T.G. wanted to move to her uncle's home in Houston because T.G. did not like living so poor. T.G. wanted to live with her wealthy uncle in Houston who had a big house and a pool. On cross-examination, Jessica L. admitted that she would leave T.G. alone with Laurel for "maybe ten or twenty minutes" at a time when she went shopping. When asked why she did not report the sexual abuse she had suffered as a nine-year old, Jessica L. testified that she did not tell anyone as a child because she was scared. Jessica L. stated that she wanted to tell her parents but did not know how they would react. She thought they might be angry with her. According to Jessica L., she did not believe T.G.'s allegations because T.G. did not exhibit any signs of sexual abuse. When asked whether her own parents noticed any signs that Jessica L. had been abused, Jessica L. replied that they had not because Jessica L. would just shut herself in her room, keeping it all inside. The following exchange then occurred between the prosecutor and Jessica L.:

Q:    You might be hurt if you have to break up with your [common law] husband and he's not able to support you, but at what – what is it going to take for you to believe it?

A:    I don't know. I really don't know.

Q: Would you need an eye witness? Someone to see it?

A: Probably.

Q: Would your parents have required an eye witness to believe you?

A: I don't know.

Q: How would you have felt if your parents – you told your parents and they said we think you are lying because nobody else saw it? Do you think that would be fair?

A: No.

Q: Right now when you are telling us. I don't – we don't know if it happened. Why should we believe you? Nobody saw it. How do we know you are telling the truth? How do we know you just don't want us to feel sorry for you? Did it happen?

A: Can I tell you something?

Q: I believe you. I believe you. I believe your daughter.

Defense counsel: I am going to object, Your Honor. What counsel believes is not important and I'll ask the State to withdraw.

State: I withdraw that comment, Your Honor.

Court: Don't consider that last comment of "I believe you" or "I don't believe you." That's not relevant to this issue. Okay?

On redirect, Jessica L. testified that the difference between what happened to her as a child and the allegations made by T.G. is that Jessica L. constantly questioned T.G. about whether anyone had ever abused her. Jessica L. testified that T.G. denied any abuse when questioned. According to Jessica L., if she had been so questioned as a child, she would have told the person about the abuse.

Laurel testified on his own behalf. At the time of trial, he was forty-one years old and described himself as Jessica L.'s common-law husband. He confirmed that he moved in with Jessica L. and her family in 2005 when she had four children living with her, including T.G. About a month before he met Jessica L., he had been laid off. He was unemployed for about four

months and then was a part-timer. He admitted that Jessica L. would leave the kids with him when she went to the store or ran errands. According to Laurel, when he started working with Triple Seven, the rent at their apartment increased. So, they all moved to Jessica L.'s father's house where they would not have to pay rent. Laurel admitted that there were times when he was alone with T.G. but denied ever sexually abusing her. When asked why T.G would lie, Laurel testified,

> Well, I gotta lot of ideas, you know, [of why she would accuse me], I gotta hundred ideas why. I mean, you know because her dad didn't get back with her mom, you know. [T.G.] wanted to move to Houston because she didn't like the way we lived, you know, the old house. And her friends had, you know, she wanted what her friends had and we couldn't afford that.

On cross-examination, Laurel was reminded that when T.G. told her father about the abuse, she was already living with her father. He was then asked why [T.G.'s] wish to move out of her mother's home was a reason for her to lie. Laurel replied that maybe T.G. was lying because she could not move back into her mother's home until he was gone.

Laurel testified that he and T.G. had a wonderful relationship right up until the time the allegations surfaced. According to Laurel, a few days before T.G. told her father that Laurel had sexually abused her, Laurel had been on the phone with T.G.'s brother, who was complaining that he was sitting on the bench and not getting to play during football games. Laurel testified that T.G. then got on the phone and started making fun of her brother. The following exchange then occurred between the prosecutor and Laurel:

Q:      And [T.G.'s brother] was playing football?

A:      Yes.

Q:      Do you realize that [the allegation of abuse] was reported in March of 2010? March.

A:      Uh-huh.

Q:     Is that football season?

A:     I don't know when is football season over there or what.

Q:     They play football in the spring?

A:     I think so. I don't know.

Q:     Is it possible that he could have told you that during football season?

A:     No, because I remember I had just talked to him, and then we got the phone call and I said what's going on, you know, I just talked, talked to her, everything was good, and then two days later we get that phone call, you know. That's how come I remember, you know, that I was talking to them about football.

The defense then called Francis Pena Villanueva, Jessica L.'s aunt, who testified that she saw Laurel with Jessica L.'s children a lot. She never saw anything wrong and would trust him with her own children.

At the conclusion of trial, a jury found Laurel guilty of continuous sexual abuse. The trial court then sentenced him to seventy-five years of imprisonment.

INEFFECTIVE ASSISTANCE OF COUNSEL

Laurel argues that he received ineffective assistance of counsel because his defense counsel failed to object to improper outcry testimony, failed to object to the State's noncompliance with Article 38.072, failed to request an outcry hearing, failed to adequately prepare for trial and conduct an independent investigation, failed to object to bad acts, failed to file a Rule 404(b) request notice, and failed to object to the State's closing argument.

We measure a claim of ineffective assistance of counsel against the two-prong test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See Hernandez v. State*, 726 S.W.2d 53, 55-57 (Tex. Crim. App. 1986) (applying *Strickland* test). The appellant must first show that his attorney's performance was deficient, i.e., that his assistance fell below an objective standard of reasonableness. *Thompson v. State*, 9 S.W.3d 808,

812 (Tex. Crim. App. 1999). Second, assuming the appellant has demonstrated deficient assistance, it is necessary to affirmatively prove prejudice. *Id.* Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Id.* at 813. An appellant bears the burden of proving by a preponderance of the evidence that counsel was ineffective, and we look to the totality of the representation and the particular circumstances of each in evaluating the effectiveness of counsel. *Id.* When reviewing a claim of ineffective assistance of counsel, we must be highly deferential to trial counsel and avoid "deleterious effects of hindsight." *Id.* There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

Further, the assessment of whether a defendant received effective assistance of counsel must be made according to the facts of each case. *Id.* at 813. Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.* Under normal circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Rarely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation. *Id.*; *Thompson*, 9 S.W.3d at 813. In the majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel. *Bone*, 77 S.W.3d at 833.

Here, there was a hearing on Laurel's motion for new trial. Laurel was the only witness to testify. Laurel testified that he hired his trial counsel to represent him in January 2011, four months before trial. He spoke with his trial counsel over the phone. According to Laurel, they

did not discuss the case until after the jury was picked, and then his trial counsel said he would show up early the next day to discuss the case, but was late the next morning:

Q: Did [trial counsel ] ever go over with you any of the testimony that the State had against you?

A: No.

Q: Did he ever mention anything like what evidence the State had against you?

A: No. He just said he had papers and he would show me when we would meet early, but he was late so we never – he never showed me nothing or discussed nothing.

Q: Okay. So you – so before trial you didn't get to discuss the case? It was during trial that you got to discuss the case?

A: Yes.

Q: And what did he ask you to do when you were beginning trial?

A: He didn't. He just told me that, you know, for me, you know, to tell my side of the story. That was about it. But we didn't even discuss about, you know, nothing because he was always late, you know. He just told me to take the stand, that was it, and I took the stand.

Q: Did he mention anything what the children – the child involved in this case or the, the father or any other witness would say about the case?

A: No.

On cross-examination, Laurel admitted that he knew the allegations T.G. had made against him because on the day T.G. made those allegations, her father called Jessica L. and told Jessica L. about them. Jessica L. then told him. So, he was aware of the allegations a year before the case went to trial. Laurel confirmed that his trial counsel appeared with him at his arraignment in January 2011 and filed his motion to reduce bond. The following exchange then occurred between the prosecutor and Laurel:

Q: And between January and March – I'm sorry – April 26th when [trial counsel] went to trial, did you make an effort to go to Corpus Christi to visit with him?

A: No, because he told me that he was going to look over all the paperwork and he would get back to me and, uh, every time I call him he would be in Court or, you know, he wouldn't answer.

Q: Do you know whether or not he got copies of the reports or the statements?

A: Not that I know of.

Q: He didn't show you a copy of the report or a copy of your [step-]daughter's statement?

A: No, sir.

Q: But you are not telling me that he didn't get those?

A: I don't know if he got them or not.

Laurel's trial counsel did not testify at the hearing. Thus, there is no evidence regarding what strategic decisions Laurel's trial counsel did or did not make.

On appeal, Laurel criticizes his trial counsel for not objecting to Jose G.'s testimony, arguing that Jose G.'s testimony about T.G.'s statements was hearsay because Jose G. was not a proper outcry witness. Laurel also argues that his counsel should have objected to the State's failure to comply with article 38.072 and should have requested an outcry hearing. He emphasizes that article 38.072 requires a party intending to offer the outcry statement provide the adverse party, on or before the fourteenth day before trial, with notice of its intent to offer the statement, the name of the witness, through whom it intends to offer the statement, and a written summary of the statement. According to Laurel, his counsel should have requested the court, pursuant to article 38.072, to conduct a hearing to determine the reliability of the outcry statement. Laurel contends that had his trial counsel requested such a hearing, the trial court would have found Jose G. was not a proper outcry witness, would have precluded him from testifying as an outcry witness, and would have found that the State failed to satisfy the notice requirements under article 38.072. Laurel argues that there is no possible strategic or tactical

basis for his trial counsel's failure to object Jose G.'s testifying as an outcry witness, failure to object to the State's improper notice, and failure to request a hearing.

Laurel emphasizes that to be a proper outcry witness under article 38.072 of the Texas Code of Criminal Procedure, T.G. would have had to have told Jose G. the details of her sexual abuse. Because T.G. did not tell him such details, Laurel argues that his counsel should have objected to Jose G. as not being a proper outcry witness. *See Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990) (explaining that a statement under article 38.072 must be "more than words which give a general allusion that something in the area of child abuse was going on"). At trial, both Jose G. and T.G. testified that T.G. did not tell her father the details of the abuse. T.G. testified that it was too hard for her to do so. In its brief, the State "concedes that while [Jose G.], the child's father, was the first person, eighteen years of age or over, to whom the child made a statement about the offense, he may not fit the criteria defining an outcry witness as contemplated by the statute, in that the child's statement to her father may not have been more than 'a general allusion that something in the area of child abuse was going on.'" (quoting *Garcia*, 792 S.W.2d at 91).

Nonetheless, the State argues that there could indeed be a strategic reason for Laurel's trial counsel's failure to object to Jose G. testifying as an outcry witness and his failure to request a hearing. According to the State, we could "easily presume that trial counsel was aware of the nature and extent of the testimony and chose to accept this witness's very limited testimony, rather than face the possibility of a more detailed 'outcry' to a medical professional or a forensic interviewer." Indeed, even Laurel in his brief admits that "[i]n reviewing the record, we can conclude that the complainant made several statements not just to her father but to several other people. According to complainant's and her father's testimony, complainant was interviewed at

the sheriff's department, at Driscoll's Hospital and another place in Corpus Christi as part of the investigation (the Children's Advocacy Center)." Thus, there is a possible strategic reason for defense counsel's failure to object and request a hearing. Any allegation of ineffectiveness is not firmly founded in the record.

Laurel next argues that his trial counsel failed to prepare for trial or conduct an independent investigation. Laurel emphasizes that his counsel never met with him to discuss strategy before trial, never showed him any evidence the State would present, and made only one discovery request four days before trial. However, Laurel's testimony at the motion for new trial hearing does not establish that his trial counsel did not prepare for trial or conduct an independent investigation. The ineffectiveness is not firmly founded in the record. Without trial counsel's testimony, we do not know the full of extent of what his trial counsel did or did not do in preparation for trial. Laurel also complains that defense counsel "failed to subpoena medical and/or psychological experts to testify in front of the jury by evaluating and explaining the evidence that was going to be introduced or the lack of medical or psychological evidence that was not introduced at trial." However, the court of criminal appeals has explained that defense counsel's failure to call witnesses is "irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (quoting *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)). Laurel has made no such showing. Further, the State emphasizes that the alleged sexual abuse in this case had stopped more than two years before trial. Thus, the availability of other witnesses or exculpatory evidence was doubtful. And, Laurel's trial counsel did call J.G.'s mother as a witness, who emphatically testified that Laurel was innocent and her daughter was lying.

Laurel next complains of his counsel's failure to object to testimony about his drug use and the fact that he was required to take drug classes as a result of the CPS investigation. He also complains of his counsel's failure to file a Rule 404(b) Request for Notice of Extraneous Offenses. The State responds that this line of questioning was proper and was admissible (1) in response to Jessica L.'s initial testimony denying any drug use, (2) to clarify that the CPS investigation was not based on any allegations of sexual abuse; and (3) to show the previous relationship between Laurel and T.G. pursuant to article 38.37 of the Texas Code of Criminal Procedure. Furthermore, the State emphasizes that the record is silent as to why defense counsel failed to object. Thus, it argues that given the importance of the issue of credibility, defense counsel may have felt that Laurel's ready admission of his drug use could have actually enhanced his credibility to the jury. We agree with the State that, with regard to the evidence concerning Laurel's drug use, defense counsel's alleged ineffectiveness is not firmly founded in the record.

Finally, Laurel argues that his counsel should have objected to the State's closing argument where, according to Laurel, the State improperly shifted the burden of proof to him. Laurel cites *Dee v. State*, 388 S.W.2d 946 (Tex. Crim. App. 1965), for the proposition that prosecutorial jury argument that shifts the burden of proof is reversible error. In *Dee*, 388 S.W.3d at 947, during closing argument in a DWI case, the prosecutor made the following argument to the jury:

> If the defendant was not intoxicated, why did he not bring in character witnesses who would testify to his reputation as to sobriety?

Defense counsel objected, the trial court sustained the instruction and instructed the jury to disregard the comment. *Id.* The trial court then denied the defendant's motion for mistrial. The court of criminal appeals noted that "said argument was not made in answer to any argument of

counsel for the appellant and that the argument was not a reasonable deduction based on any evidence in the case." *Id.* The court then noted that the State agreed in its brief "that the evidence indicates that the reputation of appellant was not raised." *Id.* The court explained that "unless the character or reputation of the accused is put in evidence by him, either directly or indirectly, the law forbids such attack by the state, either by evidence or argument." *Id.* (quotation omitted). The court then stated that it doubted "that the prejudicial effect of this statement could have been removed by the court's instruction." *Id.*

The State argues that this case is distinguishable from *Dee* because if you read the State's argument in context, it is clear the State was discussing the credibility of the witnesses and was not shifting the burden. During the State's closing argument, the prosecutor reminded the jury that when asked why T.G. would accuse him of sexual abuse, Laurel testified that he had a "lot of ideas," he had a "hundred ideas why." The prosecutor then argued the following:

> Well I counted about three. He said, "Well maybe she didn't want him in the house." Okay. That's right. She didn't want him in the house. She wanted to get away from him, but she wasn't in the house anymore. She was safe living with her father when she told her father what happened. He wasn't a threat to her anymore. Well maybe she wanted her dad to get back together with Jessica L. You know, after they had been separated for ten years? And if that's what she wanted to do, wouldn't it have made more sense for her to tell her mom, convince her mom that she's living with a monster, you know? Maybe the house was too small and dirty. Well, maybe it was, I don't know, but she wasn't living there anymore. She had been out of that house for a year and a half. She wasn't going back to live in that house. Her father had custody. Okay, that's three. I'll let the defendant fill out the rest if he's got any. And you got to ask yourself. What would make a ten-year-old child want to live anywhere but with her mother? What? What could make a child want to leave their mother? I mean, you go to the store and your kid starts crying because they want to go with you, they don't want you to leave. Before we leave the topic of credibility, remember, you are the judges of the credibility of the witnesses. By taking the stand, the Defendant put his credibility on the line. Just like Mr. Cavada is going to ask you to question [T.G.]'s credibility, you can also judge his credibility. You had a chance to watch his demeanor on the stand and compare it to her demeanor, how they acted, how they answered the questions. Just ask yourself, what motive does he have to lie, you know? I'll let you fill that part out. *Number one, what's going to happen if he*

*can't convince you that he's the one [who]'s telling the truth? What if he can't fill out these reasons and come up with at least one reasonable explanation for why she would lie?* Who has the real motive here? I am going to let Mr. Cavada present his argument. I want you to listen to it carefully. . . .

(emphasis added). The State argues that when the prosecutor's argument is read in context, the prosecutor was not trying to shift the burden to the defendant, but was instead discussing the credibility of the two witnesses: T.G. and Laurel. We agree with the State. When read in context, the prosecutor was summarizing the evidence presented at trial and then in a reasonable deduction from the evidence, discussing the credibility of the witnesses who testified. Therefore, the prosecutor's argument was not improper, and defense counsel correctly decided not to object. *See Graves v. State*, 176 S.W.3d 422, 431 (Tex. App.—Houston [1st Dist.] 2004, pet. stricken) ("Jury argument that vouches for or questions the credibility of a witness is proper if it involves a reasonable deduction from the evidence."); *George v. State*, 117 S.W.3d 285, 288 (Tex. App.—Texarkana 2003, pet. ref'd) (same).

We overrule Laurel's first issue.

### SUFFICIENCY OF THE EVIDENCE

Laurel was charged with the offense of Continuous Sexual Abuse of a Young Child, alleged to have been committed on or about September 1, 2007 (the effective date of the statute) through July 31, 2008. On appeal, he argues the evidence is insufficient to support his conviction. In a federal due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1763 (2012). This standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the

evidence." *Adames*, 353 S.W.3d at 860. Therefore, on appellate review, we determine whether based on "cumulative force of all the evidence" the necessary inferences made by the trier of fact are reasonable. *Id.* We conduct this constitutional review by measuring the evidentiary sufficiency with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.*

Texas's continuous sexual abuse statute was enacted as a response to concerns that prior law did not easily "accommodate the prosecution of generic, undifferentiated, ongoing acts of sexual abuse of children" involving the "common factual scenario of an ongoing crime involving an abusive sexual relationship of a child." *Dixon v. State*, 201 S.W.3d 731, 737 (Tex. Crim. App. 2006) (Cochran, J., concurring). Under the statute, a person commits an offense if:

(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

(2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age.

TEX. PENAL CODE ANN. § 21.02(b) (West Supp. 2012).[1] Laurel argues that the evidence is insufficient to show that he committed two or more acts of sexual abuse during a period of thirty or more days after September 1, 2007, the effective date of the statute.

At trial, the State admitted in evidence State's Exhibit 6, a chronology of significant dates associated with this case. In addition to this chronology, there was testimony that Laurel moved in with Jessica L. and her children in November 2005 and that they lived in an apartment together until April 2007 when they all moved to Jessica L.'s father's home. T.G. lived with Laurel, Jessica L., and her brothers in this home until the summer of 2008. In the summer of 2008, T.G., who was then eleven years old, moved to Houston to live with her uncle. T.G.

---

[1] Section 21.02 was amended in 2011 to add subsections (c)(7) and (8). These new subsections are not at issue in this appeal.

testified that Laurel began sexually abusing her when they were living in the apartment together and that the abuse continued after they moved to her grandfather's home. She testified that the abuse stopped only when she moved to Houston. The State specifically questioned T.G. about the period of time between September 1, 2007, when she was beginning fifth grade, and the following summer, when she moved to Houston. T.G. testified that Laurel sexually abused her during this period of time. When asked about the frequency of these incidents of sexual abuse during this period of time, T.G. testified that it would happen about once a week when her mom was gone. T.G. was then asked whether during this specific period of time, the incidents of sexual abuse stopped for any extended period of time:

Q: But more or less during this last nine or ten months, this was happening about once a week or maybe every two weeks during that whole period of time.

A: Yes.

Q: Was there ever a time where [Laurel] stopped doing this for say more than a month?

A: No.

Court: For the record, when you say doing this, what are you talking about?

Q: Whenever he started doing any of these things that you said he did to you, that either him touching your private parts or you touching his private parts.

A: No.

We hold that the evidence is sufficient to support Laurel's conviction under the continuous sexual abuse statute.

### MOTION FOR MISTRIAL

Laurel argues that the trial court erred in denying his motion for mistrial. We review the trial court's denial of a motion for mistrial under an abuse of discretion standard. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We view the evidence in the light most favorable

to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. *Id.* Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.*

Mistrial is an extraordinary remedy appropriate only for "a narrow class of highly prejudicial and incurable errors." *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). "The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case." *Id.* "The asking of an improper question will seldom call for a mistrial, because, in most cases, any harm can be cured by an instruction to disregard." *Id.* "A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Id.* "Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer, even one regarding extraneous offenses." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000).

Laurel complains about a comment made by the prosecutor during his cross examination of Jessica L., T.G.'s mother. As noted in the background section, Jessica L. testified that she had been abused by a family friend when she was nine years old and that she did not report it to anyone because she was scared. Jessica L. testified that she did not believe T.G.'s allegations because T.G. did not exhibit any signs of sexual abuse. When asked, however, whether her own parents had noticed any signs that she had been abused, Jessica L. replied that they had not because Jessica L. would just shut herself in her room, keeping it all inside. When asked if she would need to hear testimony from an eyewitness before she believed her daughter, Jessica L.

replied, "Probably." When asked if her parents would have needed to hear from an eyewitness before they would have believed her as a child, Jessica L. replied, "I don't know." The prosecutor then asked if it would be fair if she had told her parents about the abuse she suffered as a child and her parents had testified they did not believe her because no one else had witnessed it. Jessica L. replied, "No." The prosecutor then stated the following:

Q:      Right now when you are telling us, I don't – we don't know if it happened. Why should we believe you? Nobody saw it. How do we know you are telling the truth? How do we know you just don't want us to feel sorry for you? Did it happen?

A:      Can I tell you something?

Q:      *I believe you. I believe you. I believe your daughter.*

        Defense counsel: I am going to object, Your Honor. What counsel believes is not important and I'll ask the State to withdraw.

        State:   I withdraw that comment, Your Honor.

        Court:   Don't consider that last comment of "I believe you" or "I don't believe you." That's not relevant to this issue. Okay?

        State: We pass the witness, Your Honor.

Laurel later moved for a mistrial, which was denied by the court.

Laurel argues that the prosecutor, by commenting that he believed Jessica L. and T.G., "injected his beliefs on the credibility of the witnesses" and "improperly bolstered the complainant's testimony." However, given that the trial court gave a limiting instruction and the prosecutor did not repeat this comment before the jury or persist in this line of questioning, we find no abuse of discretion by the trial court in denying the motion for mistrial. *See Ovalle*, 13 S.W.3d at 783. We cannot conclude that the prosecutor's comment fell within the "narrow class of highly prejudicial and incurable errors." *Wood*, 18 S.W.3d at 648. We therefore overrule this issue.

**CLOSING ARGUMENTS**

Finally, Laurel argues that the State made improper closing arguments by arguing matters outside the record. Specifically, Laurel complains that during its rebuttal argument, the State made reference to reports and statements not in evidence. A proper jury argument must fall within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and, (4) plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999). To complain on appeal about an improper jury argument, a defendant must object at trial and pursue his objection to an adverse ruling. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) ("To preserve error in prosecutorial argument, a defendant must pursue to an adverse ruling his objections to jury argument."); *Gonzalez v. State*, No. 04-10-00803-CR, 2012 WL 1362714, at *6 (Tex. App.—San Antonio Apr. 18, 2012, no pet.). Here, Laurel's objection was sustained, and he did not pursue his objection to an adverse ruling. Thus, any error was not preserved for appeal.

Moreover, even if Laurel had preserved error for appeal, the State's argument was an answer to argument of opposing counsel and was therefore not improper. *See Guidry*, 9 S.W.3d at 154. Further, even if Laurel had preserved error and even if the State's argument had been improper, any error would have been harmless. Here, the trial court sustained Laurel's objection and instructed the jury to consider only "what came from the witness stand." As noted, Laurel did not pursue his objection to an adverse ruling; that is, he did not move for a mistrial. If Laurel had moved for a mistrial and if the trial court had denied that motion for mistrial, then the proper issue would have been whether the trial court abused its discretion in denying that motion for mistrial. *See Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004). The Texas Court of Criminal Appeals has noted that in those cases where the "only adverse ruling—and thus the

only occasion for making a mistake—was the trial court's denial of the motion for mistrial," "the proper issue is whether the refusal to grant the mistrial was an abuse of discretion." *Id.* at 77. The court has explained that "[n]evertheless, the question of whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis." *Id.* "A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* When the trial court is considering whether it should grant a mistrial after it has already sustained an objection to prosecutorial argument and has given the jury an instruction to disregard, the trial court should determine whether the prosecutorial argument is "so harmful that the case must be redone" and should conduct this harm analysis "in light of the trial court's curative instruction." *Id.* "Only in extreme circumstances, whether the prejudice is incurable, will a mistrial be required." *Id.* As noted, in this case, the trial court gave an instruction to the jury to disregard the prosecutor's argument. And, although the reports and statements referenced by the State in its rebuttal were not themselves admitted in evidence, witnesses did testify about them. Thus, if the trial court had denied a motion for mistrial, it would not have abused its discretion. *See id.*

We therefore overrule this final issue and affirm the judgment of the trial court.

Karen Angelini, Justice

Do not publish